IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| BELINDA H.,[1] | ) | |
| | ) | Civil Action No. 7:22-cv-00718 |
| Plaintiff, | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY,[2] | ) | By: C. Kailani Memmer |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Belinda H. ("Belinda") filed this action challenging the final decision of the

Commissioner of Social Security ("Commissioner") finding her not disabled and therefore

ineligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42

U.S.C. §§ 1381–1383f. Belinda alleges that Administrative Law Judge ("ALJ") Thomas W.

Erwin erred in his assessment of Belinda's (1) mental impairments; (2) physical impairments and

residual functional capacity ("RFC") findings; and (3) subjective allegations.

This case is before me on referral under 28 U.S.C. § 636(b)(1)(B), dated October 12,

2023. ECF No. 28. Belinda did not request oral argument be scheduled in this case. ECF No. 19.

Having considered the administrative record, the parties' filings, and the applicable law, I find

that the Commissioner's decision is supported by substantial evidence. Accordingly, and for the

reasons detailed below, I respectfully recommend that the presiding District Judge **DENY**

Belinda's Motion for Summary Judgment, ECF No. 18; **GRANT** the Commissioner's Motion

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

for Summary Judgment, ECF No. 26; **AFFIRM** the Commissioner's final decision denying

Belinda's SSI claim; and **DISMISS** this case from the Court's active docket.

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to

support the Commissioner's conclusion that Belinda failed to demonstrate that she was disabled

under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it

consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and

alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing

that the standard for substantial evidence "is not high"). While substantial evidence is a

somewhat deferential standard, the Court does not "reflexively rubber-stamp an ALJ's findings."

*Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017).

"In reviewing for substantial evidence, [the court should not] undertake to re-weigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the

[Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Nevertheless, the

court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize

the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v.

Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment, which can be expected to result in death or
which has lasted or can be expected to last for a continuous period for not less than 12 months." 42
U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant
suffers from an impairment which affects her ability to perform daily activities or certain forms of work;
instead, a claimant must show that her impairments prevent her from engaging in all forms of substantial
gainful employment given her age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2),
1382c(a)(3)(B).

affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## CLAIM HISTORY

Belinda filed for SSI on July 24, 2018, alleging disability beginning May 13, 2017. R. 14, 271–76. Her claim was denied both at the initial level and on reconsideration. R. 133–43, 149–55. Belinda appeared before the ALJ by telephone on December 15, 2021. R. 12–29, 37–70. At the hearing, Belinda amended her alleged date of disability to July 24, 2018, the date of her application. R. 43. Ellen Levine testified as an impartial vocational expert. R. 60–63. The ALJ issued an "Unfavorable Decision" analyzing Belinda's claim under the familiar five-step process[4] on December 28, 2021, and denied Belinda's claim for benefits. R. 9–36.

At the first step, the ALJ found that Belinda had not engaged in substantial gainful activity during the period since July 24, 2018, the application date. R. 14. At the second step, the

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether she can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a *prima facie* case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the national economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

ALJ found that Belinda has the following severe impairments: substance use disorder, bipolar, depression, posttraumatic stress disorder (PTSD), attention deficit disorder (ADD), history of peripheral neuropathy and migraines, other and unspecified arthropathies, and hepatitis C. *Id.*

As to the third step, the ALJ found that Belinda's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 16–17. The ALJ found that Belinda has moderate limitations regarding understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. R. 17–20.

The ALJ concluded that Belinda has the RFC to:

perform medium work as defined in 20 CFR [§] 416.967(c) except there can be no unprotected heights like ladders, ropes, or scaffolds. There can be no more than moderate noise exposure. She can have occasional exposure to vibration. There can be no food preparation or patient-type care responsibilities due to hepatitis. Instructions and tasks are limited to those that can be learned in thirty days or less. There can be occasional decision-making and changes in the work setting. There can be no more than occasional interaction with the public, coworkers, or supervisors.

R. 21.

At the fourth step, the ALJ concluded that Belinda has no past relevant work. R. 28.  At the fifth step, the ALJ identified jobs in significant numbers in the national economy that Belinda could perform, including positions as floor cleaner, marker, and routing clerk. R. 29. Thus, the ALJ determined that Belinda is not disabled. *Id.* The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Belinda's request for review on October 19, 2022. R. 1–6. This appeal followed.

<u>ANALYSIS</u>

Belinda argues that there is not substantial evidence to support the ALJ's assessment of Belinda's (1) mental impairments; (2) physical impairments and RFC findings; and (3) subjective allegations. ECF No. 19 at 22–38.

**A. Medical History Overview**

Belinda was born on November 22, 1988. R. 28. She has a high school education. *Id.* She briefly worked at Dollar General as a cashier in 2011. R. 324.

Belinda presented to the care of April Hazelwood, P.A., at Tri-Area Community Health on January 12, 2015, with complaints of neck and back pain that had persisted since a fall the previous week. R. 438. Belinda noted she reported to the ER immediately after the fall and x-rays were performed, but nothing was broken. *Id.* Upon examination, PA Hazelwood noted Belinda had notable tenderness to palpation of midline thoracic spine. R. 439. PA Hazelwood prescribed Tramadol and referred Belinda to physical therapy three times a week for thoracic back pain from her fall. *Id.*

On June 18, 2015, Belinda presented to the care of Jennifer Givens, N.P., at Tri-Area Community Health. R. 435. At this appointment, Belinda requested psychiatric care for "intense anger" and "irritability in personal relationships." *Id.* Belinda reported she was diagnosed with personality disorder, bipolar, and depression when she was a child, but had not taken medication since she was 18 years old. *Id.* Belinda was alert, oriented, and cooperative during her examination and maintained good eye contact. R. 436. Belinda was diagnosed with borderline personality disorder but declined psychiatric care at that time; however, she claimed she would make an appointment with Laura Ely, Ph.D., soon. R. 437.

On June 22, 2015, Belinda presented to the care of Dr. Ely at Tri-Area Community
Health for a behavioral health evaluation and related discouragement, low self-esteem,
irritability, frustration, difficulty concentrating, racing thoughts, sleep disturbance, feelings of
guilty and inferiority, fear of losing control, and suicidal thoughts. R. 432. Upon examination,
Belinda was oriented to person, place, time, and circumstances; her mood was low and anxious;
her affect was appropriate to content; there were no indications of hallucinations, delusions, or
paranoia; and her insight and judgment were good. R. 433. Dr. Ely assessed Belinda with bipolar
disorder and borderline personality disorder and advised her to return in one week. *Id.*

On July 21, 2015, Belinda presented to the care of Jason Grove, D.O., for her mood
disorder. R. 429. Belinda reported a history of moodiness, depression, irritability, suspiciousness,
anger, explosive behavior, tearfulness, crying spells, sleep disturbance, excessive worrying,
isolation, anxiety in public spaces, feelings of worthlessness, self-berating thoughts, and auditory
pseudo hallucinations. *Id.* Dr. Grove noted Belinda was awake, alert, and oriented, casually
dressed, and made appropriate eye contact. R. 430. He further noted Belinda's mood was "up
and down," her affect was stable, euthymic, glum, and mood congruent. *Id.* Her thought process
was lineal, logical, and coherent. *Id.* Belinda's thought content was notable for moderate worry
and depressive cognition, and her perception was notable for paranoia, hypervigilance, and
delusional constructs. *Id.* Dr. Grove reported Belinda's insight, intelligence, memory and
judgment were good. *Id.* Dr. Grove's medical assessment of Belinda was mood disorder and
borderline personality disorder, and he prescribed Seroquel and Buspar. R. 430–31. Belinda was
advised to return for a follow up appointment in four weeks. R. 431.

On August 18, 2015, Belinda reported for a follow-up appointment with Dr. Grove. R.
422. Belinda reported worsening of mood with Buspar with fleeting suicidal ideations, which

had discontinued. *Id.* She claimed to be tolerating Seroquel but continued to have "rage episodes" claiming she was easily aggravated and experienced tantrums, yelling, and crying. *Id.* Upon examination, she was awake and alert, appropriately dressed, and maintained appropriate eye contact. Her affect was stable, euthymic, full, and mood congruent, and her thought process was linear, logical, and coherent. R. 423. Her thought content improved from the prior appointment as she had no worry or depressive cognitions, and her perception improved as she was not notable for paranoia, hypervigilance, or delusional constructs. *Id.* Her insight, intelligence, and judgment were noted as adequate, and her memory was good. *Id.* Dr. Grove noted her progress regarding her borderline personality disorder was "fair." *Id.* Dr. Grove increased Belinda's Seroquel prescription and did not refill the Buspar. *Id.*

On January 12, 2016, Belinda presented to care of Shawn Harrison, a qualified mental health professional, at Piedmont Community Services for pre-screening. R. 767. Belinda reported a nine-year history of opiate abuse with ongoing use daily. *Id.* Upon examination, Belinda's mood was depressed, and she evidenced poor judgment. R. 769–70. Belinda's diagnoses included unspecified depressive disorder, unspecified anxiety disorder, and opioid-type dependence with continuous use. R. 770.

Later that day, Belinda presented to the emergency department at Franklin Memorial Hospital with complaints of back pain. R. 655–59. Upon examination, it was noted Belinda was a "tearful, young female whose pain is not supported by examination." R. 656. She had a normal mood and affect, exhibited normal behavior and judgment and thought content. R. 657. The treating physician noted he "reviewed more than a dozen notes from emergency medicine, PCP, and OBGYN, all of which contain significant red flags for opioid dependence . . . Upon direct questioning [it] is abundantly clear that she has an opioid dependence and is at high risk for

death due to addiction." *Id.*[5] Final impression was chronic abdominal pain and opioid

dependance with opioid-induced mood disorder. R. 659.

On May 20, 2016, Belinda saw Ashley King, a qualified mental health professional, at

Piedmont Community Services for an assessment from a referral from the Department of Social

Services and her probation officer following a violation of her probation based upon drug usage

and losing custody of her daughter. R. 781–82. Belinda claimed she had a history of trauma and

was using opiates as a "coping mechanism" since she was a teenager. R. 781. She sought

services from Piedmont Community Services to participate in a substance abuse group, to

receive mental health counseling, and treatment from a psychiatrist. *Id.*

On May 22, 2016, Belinda presented to the emergency department at Franklin Memorial

Hospital with complaint of back pain that persisted for two days after she fell down a flight of

stairs. R. 1067. Upon examination, it was noted Belinda had tenderness to palpitation over the

lower cervical/upper thoracic spine, but CT scan results were unremarkable. R. 1068–69. She

was assessed with a paraspinal muscle spasm and was prescribed Robaxin and advised to return

if her pain did not improve in one week. R. 1070.

On May 27, 2016, Belinda presented for care with Andre Douglas, FNP, at Lewis Gale

Physicians with complaints of migraines, back pain, and sleep disturbance. R. 743. Belinda

claimed she was "unable to function at work" due to her symptoms. *Id.* Her examination was

unremarkable other than tenderness to palpation of the thoracic and lumbar spines. *Id.* She was

---

[5] From February 2, 2013 to December 13, 2016, Belinda was seen at the emergency department at
Franklin Memorial Hospital on 36 occasions, mainly with complaints of pain. R. 508–698. From March
18, 2015 to April 6, 2016, Belinda reported to the emergency department at Lewis Gale Medical Center
on eight occasions for evaluation and treatment of flank and abdominal pain. R. 507, 553.

prescribed Imitrex for migraines, amitriptyline for insomnia, and referred to physical therapy for her back pain. *Id.*

On June 20, 2016, Belinda presented to the emergency department at Lewis Gale Medical Center for treatment of pain that was attributed to a kidney stone. R. 715–24.

On June 30, 2016, Belinda presented to the emergency department at Franklin Memorial Hospital with complaints of episodes that "look like seizures," stating she was "completely incoherent" for a minute. R. 1061. During one episode, she hit her head on the bathtub causing a migraine. *Id.* Upon review of systems, she was oriented to person, place, and time, her coordination and gait were normal, and she did not appear to be in distress. R. 1063. She had a normal mood and affect. *Id.* CT scan of her head/brain showed no evidence of acute intracranial abnormality. R. 1065. The final impression was seizure-like activity. R. 1067.

On July 6, 2016, Belinda presented to the emergency department at Franklin Memorial Hospital with complaints of left flank pain and nausea. R. 1058. Belinda underwent a renal ultrasound that showed non-obstructing left mid kidney stone with no evidence of hydronephrosis. R. 1060. The encounter diagnosis was acute nephrolithiasis, acute left flank pain, acute nausea, vomiting, and elevated liver function testing. The impression was Belinda "probably [had] chronic Hep C." R. 1061.

On November 9, 2016, Belinda had a follow-up appointment with NP Douglas at Lewis Gale Physicians. R. 747. Belinda reported she was "doing well on medications" and ran out due to a car accident and not being able to make appointments. *Id.* Belinda's examination was unremarkable, noting her affect was normal, good eye contact, alert and oriented, appropriate mood and affect, and no thought disorder. *Id.* Her prescriptions were refilled, including Amitriptyline and Gabapentin for migraines. *Id.*

9

On December 19, 2016, Belinda saw Guyton Register, M.D., at Piedmont Community Services for a psychiatric evaluation. R. 815. Belinda's main complaint was that she "need[ed] to feel better," claiming she experienced anxiety, depression and mood instability. *Id.* Belinda claimed she had a history of opioid use disorder, and her last opioid use was in June 2016. *Id.* Upon examination, she was noted to be well developed, well nourished, with a mesophotic body habitus without obvious deformities and with disheveled grooming. *Id.* She was alert and oriented to person, place, and time, with intact recent and remote memory based upon her ability to relate consistent past history. *Id.* Her affect was blunt, and mood was congruent, rate of speech and thought processes were diminished, and she evidenced fair-to-good insight and judgment. R. 815–16. Dr. Register diagnosed Belinda with uncomplicated opioid dependence and unspecified anxiety disorder, and prescribed Seroquel, Gabapentin, and Clonidine and referred Belinda to counseling for additional evaluation and treatment. R. 816.

Later that day, Belinda presented to the emergency department at Lewis Gale Medical Center for treatment of right flank pain that was attributed to a urinary tract infection, enteritis, and ovarian cyst. R. 727–35.

On January 19, 2017, Belinda saw Robin Mays, a qualified mental health professional, at Healing Strides of Virginia for a psychotherapy intake. R. 834. Belinda reported she was seeking treatment because her oldest child was removed from her home by the Department of Social Services, and she was at risk of having her youngest child removed if she did not change her "lifestyle." *Id.* Upon examination, her systems were noted to be appropriate, good, normal, or unremarkable. *Id.* Belinda reported she was currently using opiates and was drug tested on January 18, 2017. R. 835. She was diagnosed with acute post-traumatic stress disorder. *Id.*

On January 20, 2017, Belinda saw FNP Douglas at Lewis Gale Physicians with complaints of stomach pain, pain with urination, and numbness in her pinky toes. R. 749. Belinda was assessed with dysuria and neuropathy and was prescribed Cipro and Pyridium, and her Gabapentin dosage was increased. R. 749–50.

On January 25, 2017, Belinda saw Lynne Johnson, a licensed clinical social worker, at Healing Strides of Virginia for a psychotherapy session. R. 837. Belinda reported "inconsistency in mood due to chronic drug use and withdrawal" and that she had not stabilized her drug use and was scheduled to enter detox for stabilization. *Id.* At this session, Belinda was oriented and alert, euthymic, her functional status was intact, her affect was appropriate, and she was interactive. *Id.*

On the same day, Belinda saw Ashley King, a therapist at Piedmont Community Services, for an assessment for services, but she was recommended immediate admission to the crisis stabilization unit due to her depressed mood and substance abuse. R. 824. Belinda looked visibly depressed, tired, and was very tearful during her assessment with Ms. King. R. 824–25. Belinda reported relapsing on opiates and had intermittently used methamphetamines. R. 825. The following day, on January 26, 2017, Belinda left the crisis stabilization unit against medical advice. R. 828. On January 28, 2017, Belinda was admitted to a treatment facility, Pathway's in Lynchburg, Virginia, and was discharged on January 30, 2017, with a one-week prescription for 8 mg of Suboxone. R. 831.

On February 1, 2017, Belinda saw Robin Mays at Healing Strides of Virginia for a psychotherapy session. R. 840. Belinda was noted to be oriented/alert, exhibited a euthymic mood, and an appropriate affect. *Id.* Belinda reported she had a negative drug test following her inpatient treatment and was feeling stable on Suboxone. *Id.*

11

On February 8, 2017, Belinda presented for an initial assessment for Suboxone treatment with David Hartman, M.D., at Carilion Clinic Psychiatric and Behavioral Medicine. R. 877. Belinda denied using opiates since her inpatient treatment at Pathways the previous month. *Id.* Upon examination, Belinda's mood was stable, speech was coherent and goal-directed, memory was good, and her insight and judgment were fair. R. 878. Belinda was advised to return the following day for introduction to Suboxone treatment. *Id.* On February 9, 2017, Belinda returned and was prescribed Suboxone. R. 880.

From March 9, 2017, to December 28, 2017, Belinda generally saw Dr. Hartman twice a month for psychopharmacological management sessions. R. 884–965. Over this period of time, Dr. Hartman diagnosed Belinda with opioid dependence, depression, post-traumatic stress disorder, and attention deficit. R. 899. Belinda was prescribed medication to treat her mental health conditions, along with Suboxone. *Id.*

On November 9, 2017, Belinda presented to the emergency department at Franklin Memorial Hospital with complaints of headache that persisted for two weeks and reports of two fainting episodes. R. 1006. CT scan of her head/brain was negative for acute intracranial findings, and an EKG showed normal sinus rhythm with no significant change from a previous study in June 2016. R. 1009–10. Belinda was discharged in improved condition and advised to follow up with a neurologist. R. 1010.

On January 25, 2018, Belinda attended a group therapy session through her Suboxone treatment. R. 971. At this session, it was reported that Belinda's last drug screen was "clean." *Id.*

On March 6, 2018, Belinda saw Michael Phillips, a licensed clinical social worker at Carilion Clinic Psychiatric and Behavioral Medicine, for an individual psychotherapy session. R. 998. At this appointment, Belinda reported feeling more depressed during the previous week. *Id.*

12

Two days later, Belinda attended a group therapy session where she reported she was "doing well overall," and was not using drugs. R. 996.

On April 8, 2018, Belinda saw Dr. Hartman for a psychopharmacological management appointment. R. 993. Dr. Hartman noted Belinda missed several appointments over the last month due to her inability to get time off of work, however, she was able to maintain her sobriety. *Id.* Her mental status examination was unremarkable as she was stable, pleasant, cooperative, and exhibited good memory, fair insight and judgment. *Id.* Dr. Hartman noted she was "working hard at her job." *Id.*

On June 5, 2018, Belinda saw Dr. Hartman for a follow-up psychopharmacological management appointment. R. 989. At this appointment Dr. Hartman discussed Belinda's recent behavior of requesting early refills and being rude to staff. *Id.* She was pleasant, cooperative and goal directed during the appointment, but her mood was frustrated, and her insight was only limited. *Id.* Dr. Hartman continued Belinda's Suboxone prescription, recommended once a month group therapy and continued drug screens. *Id.*

On July 17, 2018, Belinda attended a group therapy session where it was noted she was sober for more than a year on Suboxone. R. 984–85.

Belinda saw Dr. Hartman for follow-up psychopharmacological management appointments on August 28, 2018, and January 24, 2019. R. 1485–86, 1584. At her August appointment, she reported frustration and was very upset because she lost custody of her son. R. 1485. Despite the unfortunate circumstances, Belinda's overall mood was positive as she stated she had dreams and goals and was determined to make a life for herself. *Id.* She also evidenced good memory, insight and judgment during the appointment. R. 1486. Dr. Hartman noted Belinda had been clean and sober for more than one year. *Id.* Belinda also exhibited good

insight, memory, and judgment during the January 2019 appointment and appeared pleasant and

cooperative. R. 1584.

On February 13, 2019, Belinda presented for a consultative examination with William

Humpries, M.D., with Disability Determination Services. R. 1517–20. Belinda claimed her chief

medical condition was Hepatitis C with symptoms of nausea, vomiting, and burning pain in the

left upper quadrant. R. 1517. Upon review of her systems, Belinda reported pain in the left flank

area intermittently brought about by excess use of the back, fibromyalgia, and headaches. *Id.* She

was pleasant, related well and was cooperative, and was able to move on and off the table

without difficulty. R. 1518. She also exhibited tenderness to palpation in the mid epigastric

region, neck, and lower thoracic and upper lumbar region. R. 1518–19.

Her neurological examination reflected normal mental status and higher cortical function.

R. 1519. She had no motor or sensory loss of the extremities, her grip was 5/5, no hand atrophy

or muscle wasting in lower extremities, fine manipulation was performed normally, her gait was

within normal limits, she was able to briefly heel and toe stand, and her tandem gait was

performed adequately. *Id.* Dr. Humpries diagnosed Belinda with fibromyalgia by history with

multiple myalgias, Hepatitis C by history without evidence of hepatic failure, acute URI, chronic

thoracolumbar strain, and recurrent headaches. *Id.* He provided the following functional

assessment and medical source statement: Belinda can sit, stand, and walk six hours in an eight-

hour workday, can occasionally lift 50 pounds and frequently lift 25 pounds, and has no

manipulative limitations. R. 1519–20.

On February 22, 2019, Belinda had a follow-up appointment with Dr. Hartman. R. 1582.

Belinda reported she was "doing good and staying clean," but she claimed she was not doing

well mentally. *Id.* She reported she was starting school in May and was getting some exercise by

walking. *Id.* Dr. Hartman noted Belinda had a "very positive approach" and she appeared

pleasant, cooperative, goal directed, and her overall mood was positive in spite of her sorrow and

disappointment. *Id.* She also had good memory, insight, and judgment. *Id.* She was continued on

Suboxone. *Id.*

On March 6, 2019, Belinda had a follow-up appointment with Dr. Hartman. R. 1580. She

admitted to using marijuana and taking Tramadol. *Id.* She remained positive, and the results of

her mental status examination remained the same as her prior appointment. *Id.* On April 1, 2019,

Belinda saw Dr. Hartman and relayed she was feeling depressed and was worried about

relapsing, although she stated she did not want to take medication for her depression. R. 1578.

She remained positive, her mental status examination findings were unremarkable, and she noted

she was working on writing a book about her life. *Id.*

On April 3, 2019, Bert Spetzler, M.D., a state agency physician with Disability

Determination Services found Belinda's migraines and other disorders of her gastrointestinal

system were non-severe R. 106. On the same day, Julie Jennings, Ph.D., also a state agency

physician with Disability Determination Services, found Belinda's anxiety and obsessive-

compulsive disorders and depressive, bipolar and related disorders were severe. *Id.* However, she

also noted that there was insufficient evidence to assess the impact of the mental impairments on

Belinda's functional capacity. *Id.*

On April 15, 2019, Belinda saw Dr. Hartman for a follow-up appointment. R. 1576. She

reported she was "really depressed" as she decided not to fight for custody of her kids and

requested medication for her depression. *Id.* She admitted to using marijuana since her last

appointment. *Id.* She reported she would be starting school soon to get her "10 month business

certificate." *Id.* Her mental status examination findings were unremarkable. *Id.* Dr. Hartman

continued Belinda on Suboxone and Neurontin and added a new prescription for Lithium. R. 1577.

On May 2, 2019, Belinda saw Dr. Hartman for a follow-up appointment. R. 1574. Belinda reported she was "doing good" and that the Lithium was helping her depression. *Id.* Her mental status examination findings were unremarkable. *Id.*

On June 7, 2019, Belinda saw Dr. Hartman for a follow-up appointment. R. 1572. Belinda reported she was "doing okay" and "staying clean." *Id.* Her mental status examination findings were unremarkable. *Id.* However, she tested positive for methamphetamines and marijuana immediately following this appointment. R. 1570.

On July 3, 2019, Belinda saw Dr. Hartman for a follow-up appointment. *Id.* She reported she is "same old, same old," but also stated she was "feeling lost" and that her depression worsened since her last appointment. *Id.* She claimed to "hate[] herself" for slipping and using methamphetamines. *Id.* Belinda was continued on Suboxone, but Dr. Hartman decreased her Neurontin. *Id.*

Belinda saw Dr. Hartman on seven occasions between August 2, 2019, and January 17, 2020. R. 1554–68. During this time period, she tested positive for marijuana on one occasion but otherwise did not test positive for controlled substances. R. 1566. During her appointment on October 11, 2019, she reported she was "not doing well," her overall mood was depressed, and she was noted to be crying during her appointment. R. 1562. Dr. Hartman prescribed Cymbalta. *Id.* At the following appointments, Belinda's mood was upbeat and positive, and she reported to be doing "good" and staying clean. R. 1554–60. Her mental status examination findings were unremarkable at these appointments, showing good memory, insight, and judgment.

On April 5, 2020, Belinda presented to the emergency department at Franklin Memorial Hospital with complaints of parasites in her nose, eyes, and scalp. R. 1645. The examining physician did not find an signs of parasites and noted that Belinda's presentation was "highly suggestive" of delusional parasitosis secondary to methamphetamine abuse. R. 1647. Belinda denied use of methamphetamines, but the physician noted that a recent drug screen was positive for methamphetamines. *Id.*

Belinda returned to the emergency department at Franklin Memorial the following day with similar complaints. R. 1642–43. Upon examination, it was noted that Belinda was hyperkinetic and agitated. R. 1644. She had obvious paranoid delusions that worms were crawling all over her skin although it did not seem to be the case. *Id.* It was again suspected that this was a result of methamphetamine induced delusions of paranoia and parasitosis. *Id.* Belinda was discharged as a review of her symptoms were otherwise unremarkable and she was advised to follow up with her primary care physician. R. 1645.

On April 13, 2020, Belinda had a follow-up appointment with Dr. Hartman that occurred telephonically due to the COVID-19 pandemic. R. 1748. Belinda reported she was "not feeling too great" and acknowledged her positive drug screen in March 2020. *Id.* She felt more depressed at this appointment and claimed, "she lost everything she had." *Id.* However, findings from her mental status examination reveal she was upbeat and positive about being independent with Dr. Hartman noting she "has a good attitude right now." *Id.* Belinda saw Dr. Hartman on April 27, 2020, and she claimed she was doing "good" and reported she was "doing some schooling working on getting a business license." R. 1746. She was noted to be in a good mood and had a positive attitude. *Id.*

On May 11, 2020, Belinda had a follow-up appointment with Dr. Hartman where Belinda claimed she was doing "really good" and had not used methamphetamines since her last positive drug screen in March. R. 1744. She reported she was working on her schooling from home and was working on getting her business certificate. *Id.* The findings from her mental status examination were unremarkable. *Id.* Belinda had follow-up appointments with Dr. Hartman on May 27, 2020, and June 10, 2020. R. 1740–43. She reported she was doing "very good" on May 27, but felt more depressed on June 10. *Id.* She requested an increase in her Suboxone on June 10 due to increased cravings, but Dr. Hartman did not increase her dosage. R. 1740. Her Cymbalta dosage was increased to twice daily as a result of Belinda's complaint of increased depression. *Id.*

On June 23, 2020, Belinda presented to VelocityCare with complaints of leg pain and abdominal pain. R. 1691–92. Upon examination, it was noted that Belinda had generalized tenderness to palpation over the abdomen, "many" bites on the arms and legs with scarring, bruising on the legs, and a laceration on the lower medial aspect of the left leg with infection. R. 1694. The physician's impression was moderate stool suggesting constipation and Belinda was sent to the emergency department for evaluation of possible ileus identified on x-rays of the abdomen. R. 1694, 1715.

Belinda saw Dr. Hartman for follow-up appointments on June 24, 2020, July 1, 2020, and July 15, 2020. R. 1728–34. At the June 24 appointment, Belinda said she was doing "better" and that her blockage improved after being seen at the emergency department at Lewis Gale. R. 1732. She reported she maintained her sobriety. *Id.* Her mental status examination findings were unremarkable. *Id.* On July 1, Belinda claimed she was not using methamphetamines anymore, but her drug screen from that day was positive for methamphetamine and marijuana. R. 1730.

Her mental status examination findings were unremarkable. *Id.* On July 15, Belinda reported she was doing "alright" and staying at a hotel. R. 1728. She stated she ran out of her Suboxone. *Id.* Her mental status examination findings were unremarkable. *Id.*

On July 11, 2020, Belinda saw Matthew Wilson, M.D., a state agency physician with Disability Determination Services, for a consultative examination. R. 1677–84. Belinda claimed disability based upon obsessive compulsive disorder, anxiety, panic attacks, manic depression, bipolar disorder, anger problems, fibromyalgia, hepatitis C, migraines, paranoia, and borderline personality disorder. R. 1678. Belinda provided a history of her present illnesses regarding her physical and mental impairments. *Id.* Dr. Wilson conducted a physical and mental examination and reviewed Belinda's previous medical records before providing his opinion regarding Belinda's alleged disabilities. R. 1680–83.

As for her mental impairments, Dr. Wilson noted Belinda was alert and had good eye contact and fluent speech during examination and her mood was appropriate with clear thought processes. R. 1682. Dr. Wilson noted Belinda's memory was normal and her concentration was good, and she was oriented to time, place, person, and situation. *Id.* Dr. Wilson made similar findings regarding Belinda's migraines further claiming she did not appear to have a migraine on exam. R. 1683. As for hepatitis C, Dr. Wilson noted Belinda's abdomen was soft, non-distended with normally active bowel sounds, no organomegaly, hepatomegaly or mass appreciated, tenderness to palpation of the right upper quadrant, and Belinda was not fatigued during her examination. *Id.* As for fibromyalgia, Dr. Wilson noted upon examination that Belinda had a symmetric, steady gait, she was able to ambulate around the exam room, good hand eye coordination, normal muscle strength bilaterally, sensory examination was normal, straight leg test was negative bilaterally, no joint swelling, erythema, effusion or deformity, and she was able

19

to perform musculoskeletal exam maneuvers without difficulty. *Id.* Dr. Wilson provided the

following opinion in review of the overall records he reviewed and Belinda's examination:

> The claimant provided us with her best effort during the examination. The claimant can be expected to sit, stand and walk normally in an 8-hour workday with normal breaks. The claimant does not need an assistive device with regards to short and long distances and uneven terrain. The claimant can be expected to carry 20 pounds frequently and 30 pounds occasionally. There are no limitations on bending, stooping, crouching, squatting, and so on and the claimant will be able to perform these frequently. There are no manipulative limitations on reaching, handling, feeling, grasping, fingering, pushing, pulling, and the claimant will be able to perform these frequently. There are no relevant visual, communicative or work place environmental limitations.

R. 1683.

On August 14, 2020, David Bristow, M.D., a state agency physician with Disability

Determination Services, found Belinda's migraines and other disorders of the

gastrointestinal system were non-severe. R. 124. On the same day, William Carne, M.D.,

a state agency psychologist with Disability Determination Services, found Belinda's

anxiety and obsessive-compulsive disorders, depressive, bipolar, and related disorders, and

substance addiction disorders were non-severe. R. 124. In review of her mental

impairments, Dr. Carne found only mild limitations in her mental functioning. *Id.*

On August 18, 2020, Belinda had a follow-up appointment with Dr. Hartman. R. 1844–

45. Dr. Hartman noted Belinda seemed to be doing better as she stated she is remaining clean

and sober, although she tested positive for methamphetamines in July. R. 1845.

At her next appointment with Dr. Hartman, on September 1, 2020, Belinda admitted she

used methamphetamines in an effort to cope with the recent overdose death of a friend. R. 1842.

Dr. Hartman noted that Belinda "had done well for several years, but over the last 6 months has

become more involved with methamphetamines" stating that the drug use "seems to be related to

her male boyfriend relationship." *Id.* Her mental status examination findings were unremarkable. *Id.*

On September 15, 2020, Belinda had a follow-up appointment with Dr. Hartman. R. 1836. Her most recent drug screen on September 8 was positive for methamphetamines and marijuana. *Id.* Belinda reported she was doing "okay," but her mood was depressed and tearful at times explaining that her boyfriend left her 8 days ago. *Id.* Dr. Hartman recommended inpatient treatment, but Belinda stated she preferred an in-person appointment. *Id.*

On October 20, 2020, Belinda had a follow-up appointment with Dr. Hartman. R. 1822–23. Belinda acknowledged she was having a hard time with her sobriety citing homelessness and her Suboxone getting stolen. *Id.* That same day Belinda was drug screened and tested positive for amphetamines, methamphetamines, marijuana, and norfentanyl. R. 1823–24.

On November 25, 2020, Belinda had a follow-up appointment with Dr. Hartman. R. 1816–17. Belinda reported she was just released from jail after having been incarcerated for 30 days. *Id.* Her mental status examination findings were unremarkable. *Id.* Dr. Hartman again asked Belinda to consider residential inpatient treatment. *Id.*

On March 10, 2021, Belinda presented for a Suboxone assessment at Carilion Clinic. R. 1791. She reported that her most recent illicit drug use was Suboxone she got "on the street" and marijuana the previous day. R. 1793. The treating physician noted Belinda's mood was good, her affect was euthymic and appropriate to the setting, her thought process was linear and organized, and she appeared normal with good hygiene, fair grooming, cooperative attitude and good eye contact. R. 1796. Belinda was deemed eligible for treatment and was started on Suboxone. R. 1797–98.

On March 17, 2021, Belinda presented to the emergency department at Roanoke Memorial Hospital with complaints of nausea, vomiting, and bugs on her skin and in her hair, nose, vomit, and stool. R. 1782–84. She denied illicit drug use other than marijuana. R. 1784. Upon examination, her mood was anxious, and she was noted to have widespread excoriation on the arms, hands, legs, face and abdomen. R. 1788. The final impression was acute Ekborn's delusional parasitosis and acute itching, and records indicate that Belinda left the facility before she could provide a specimen for urine drug screen. *Id.* Belinda returned later that day with similar complaints but left before an examination. R. 1789. On this same day, Belinda was removed from the outpatient based Suboxone treatment program at Carilion Clinic because she failed to return after her initial assessment. R. 1780.

On March 23, 2021, Belinda reported to the emergency department at Roanoke Memorial Hospital seeking treatment for opiate addiction. R. 1771–76. Records indicate she was prescribed Suboxone and Naloxone and advised to follow up with an outpatient clinic. *Id.*

Belinda was incarcerated at the Western Virginia Regional Jail for periods of time between December 23, 2020, and December 7, 2021. R. 1962–2140.

### B. Administrative Hearing Testimony

At the administrative hearing on December 15, 2021, Belinda was incarcerated but testified telephonically. R. 37–65. She testified that she did not graduate high school but obtained a GED. R. 46. Belinda claims it was "impossible" for her to work because she is "not good around people." R. 46–47. She further testified that she was incarcerated almost one year on a charge of distribution, but she expressed hope that she would be released after her next court date in January 2022. R. 47–48. Belinda testified that her sobriety during incarceration did not affect her mental health claiming it "does not make it any better or worse." R. 48.

Belinda acknowledged that she was trying to get a certificate for sign language interpreting during the summer of 2020, but she "gave up" due to anxiety and PTSD indicating that "something always interferes" with her attempts to return to the workforce. R. 49.

When questioned about anxiety attacks, Belinda testified that they cause her to feel as if she cannot breathe and that something heavy is on her chest. R. 50. She further claimed she "overthink[s] everything" and that she freaks out and it is like a "manic mode" sets in. *Id.* Belinda claimed these episodes last for five or ten minutes, but "it feels like forever." R. 51–52.

When questioned about her depression when she is sober, Belinda testified that she is manic-depressive and experiences crying spells. R. 52–53. Belinda claimed she did not like to take her medication because it "numbs [her] out." R. 53. She testified that she had the side effect of "really bad night terrors" caused by her medication. *Id.* Belinda testified that her PTSD cause her to become "mad" and get into arguments with people. R. 54. She also testified that she has a lengthy history of difficulty concentrating, focusing, and finishing tasks. R. 54–55.

Belinda testified that she has hepatitis C which causes her constant stomach pain. R. 55. She testified that Dr. Hartman referred her to a specialist for evaluation and treatment but when asked why she never saw the specialist, she responded, "I don't know" and "I didn't have a vehicle at the time." *Id.* Belinda also testified that she experiences migraines about twice a month and that they cause her to lie down until she feels better. R. 55–56. Her migraines tend to last around one to two hours and make her eyes hurt. *Id.*

Belinda further testified that she experiences neuropathy in her feet and her feet swell every day. R. 56. She said she can stand for 15 to 20 minutes before she has to change positions and that she has back pain that comes and goes. *Id.* She testified that she can sit for "not even 5, 10 minutes" before she has to change position when sitting down. R. 57–58.

Belinda claimed she has sleep issues outside of the night terrors, claiming she has never

been able to sleep through the night. R. 57. She typically feels aggravated when she wakes up

and is tired or fatigued. *Id.* Plaintiff testified that she lays down approximately 75% of the day

due to her depression while incarcerated, but that she was laying down about 50% of the day

before she went to jail. R. 59.

**C. The Commissioner's Decision is Supported by Substantial Evidence**

Belinda argues that there is not substantial evidence to support the ALJ's assessment of

Belinda's (1) mental impairments, (2) physical impairments and RFC findings, and (3) subjective

allegations.

**1.  The ALJ's Assessment of Belinda's Mental Impairments**

Belinda argues that the ALJ failed to properly assess her mental impairments as required

by SSR 96-8p. *See Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*,

SSR 96-8p (S.S.A. July 2, 1996).

SSR 96-8p requires an ALJ to include a narrative discussion describing how the evidence

supports his conclusion when developing the RFC. *See Teague v. Astrue*, No. 1:10-cv-2767,

2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion

describing how the evidence supports each conclusion, citing specific medical facts (e.g.,

laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p at

*7; *Meadows v. Astrue*, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24 (W.D. Va. Aug.

15, 2012); *see also Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the

ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding

that remand was appropriate when the ALJ failed to make "specific findings" about whether the

claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In *Shinaberry v. Saul*, 952, F.3d 113 (4th Cir. 2020), the Fourth Circuit confirmed that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" *Shinaberry,* 952 F.3d at 121 (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015)). Nevertheless, *Mascio* does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." *Id.* In contrast, *Shinaberry* highlights "sister circuits" which conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." *Id.* (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). *Shinaberry* further confirms that *Mascio* simply emphasizes the ALJ's duty to adequately review the evidence and explain his decision.

As for Belinda's mental impairments, the ALJ explained why Belinda's moderate limitations in interacting with others and concentration, and mild limitations in persistence or pace did not translate into a limitation in the RFC beyond that imposed. The ALJ considered Belinda's substance use disorder, bipolar disorder, depression, PTSD, and ADD. R. 12–29. The ALJ summarized, in detail, Belinda's history of mental health treatment, inpatient hospitalizations, and substance abuse treatment. R. 22–28. However, the medical evidence reflects that aside from instances of variable mood and affect, Belinda's mental examination findings for the most part were "entirely normal" when treating with her Suboxone provider. R.

25. As stated by the ALJ, her treatment notes reflect that Belinda was generally pleasant and cooperative, and her overall mood was positive and her speech, thought process, thought content, short-term memory, long-term memory, insight, and judgment were all within normal limits. *Id.* The ALJ further considered that after a period of relapse and incarceration, her mental status examination findings were "generally within normal limits aside from a variable mood and affect." *Id.*

The ALJ further provided an extensive analysis at Step 2 and 3 regarding Belinda's mental impairments, citing to the relevant medical evidence, Belinda's allegations, and her activities of daily living. *See* R. 17–20. *See Keene v. Berryhill*, 732 Fed. App'x 174, 177 (4th Cir. 2018) (finding that the Court "must read the ALJ's decision as a whole," and that an ALJ's conclusions in one step can be upheld based on findings in other steps of the five-step process). The ALJ did so in this case, and he states in Step 4 that, "[t]he claimant's mental residual functional capacity is described **in more detail** in finding three above." R. 25. (emphasis added). Such examination of the evidence provides the court with the ability to engage in a meaningful review of the ALJ's mental RFC findings.

Belinda's assertion that the ALJ did not explain how the RFC findings address or accommodate her moderate limitations with interacting with others and concentration, and mild limitations in persistence or pace is unfounded.[6] The ALJ provided a lengthy narrative discussion of Belinda's allegations, treatment records, opinion evidence, and other relevant evidence

---

[6] Belinda argues that the ALJ failed to address her ability to sustain work over an eight-hour day. ECF No. 19 at 24. The purpose of the RFC is to assess "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." *See* 20 C.F.R. § 404.1545(b); SSR 96-8p, 1991 SSR LEXIS 5, 1996 WL 374184 at *1-2. Here, the ALJ determined that Belinda could perform sustained work activities in an ordinary work setting on a regular and continuing basis with particularized limitations and accommodations. The ALJ provided a narrative discussion explaining his conclusions and the evidence supporting the RFC determination.

regarding her mental health limitations. The ALJ considered Belinda's allegations of difficulty being around people and with concentration, persistence, and pace at length in his opinion. The ALJ explained how his RFC is supported by Belinda's mental health treatment records and carefully analyzed each facet of her mental health impairments. Accordingly, I find that the ALJ's assessment of Belinda's mental impairments was sufficient under SSR 96-8P.

2.  **The ALJ's Assessment of Belinda's Physical Impairments and RFC Findings**

Belinda argues that the ALJ erred in his assessment of Belinda's physical impairments by failing to determine Belinda's RFC using a function-by-function analysis. *See* ECF No. 19 at 28–31.

The ALJ is required to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. *See* SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7. However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r*, 769 F.3d 861, 865 (4th Cir. 2015) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

In *Mascio v. Colvin*, the Fourth Circuit rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the

Second Circuit that "[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ discussed Belinda's physical impairments and resulting limitations. R. 12–29. The ALJ discussed Belinda's peripheral neuropathy, migraines, arthropathies, and hepatitis C. *Id.* The ALJ summarized the findings from Belinda's physical consultative examinations in February 2019 and July 2020 where the findings were mostly normal. R. 24. For example, the ALJ noted that during her July 2020 examination Belinda "was able to perform manipulative activities, squat and rise, and rise from a seated position without assistance. She could walk on heels and toes, perform tandem gait, and hop on either foot bilaterally." R. 24–25. Her range of motion was within normal limits during both examinations. *Id.*

The ALJ also noted the following regarding Belinda's physical impairments:

> At the hearing, the claimant complained of back pain, abdominal pain, and headaches. Aside from a prescription for gabapentin, which was prescribed by her Suboxone treating provider, the claimant had no regular complaints, objective examination abnormalities, or treatment for any of her alleged physical impairments. She had two physical consultative examinations, which noted various areas of tenderness to palpation, but her gait, strength, range of motion, and sensation were intact across both examinations.

R. 25. Although Belinda noted she could walk only ten minutes before having to rest for five minutes, she later reported that she was walking for exercise and walking 100 laps per day during her most recent incarceration. R. 22, 25.

Even with the limited evidence in support of her physical impairments, the ALJ took Belinda's alleged symptoms into consideration by restricting her to medium work with no unprotected heights, occasional vibration and no more than moderate noise exposure to

accommodate her reports of headaches, and eliminating her ability to work in food preparation or patient care as a result of her hepatitis C. *Id.*

Overall, I find that the ALJ engaged in a sufficient narrative description as required by SSR 96-8p, and that his assessment of Belinda's physical impairments and RFC findings is thorough enough to allow this Court to undertake meaningful review of his assessment. To the extent that Belinda's arguments amount to a request that this Court reweigh the evidence and reach a different conclusion, such a request is impermissible, and I decline to do so. Therefore, the ALJ did not err in his assessment of Belinda's physical impairments and RFC findings.

### 3. The ALJ's Assessment of Belinda's Subjective Allegations

Belinda also argues that the ALJ's assessment of her subjective allegations is not supported by substantial evidence. Specifically, she argues that the ALJ ignored or minimized evidence in the record, as well as failed to qualify the extent to which Belinda performed daily activities. ECF No. 19 at 31–38.

The ALJ follows a two-step analysis when considering a claimant's subjective statements about her impairments and symptoms. *See* SSR 16-3p, 2016 WL 1119029 (S.S.A. Oct. 25, 2017); 20 C.F.R. § 404.1529(b)–(c). First, the ALJ determines whether there is objective medical evidence showing a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms. *Id.* Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other

relevant evidence in the individuals' case record." *Id.* An ALJ's assessment of the credibility of a

claimant's subjective complaints is afforded a high level of deference on review, as the Fourth

Circuit has proclaimed such assessments are "virtually unreviewable" on appeal. *Darvishian v.

Geren*, 404 F. App'x 822, 831 (4th Cir. 2010).

In this case, the ALJ's opinion includes a thorough and robust discussion of both

Belinda's medical history and Belinda's allegations. R. 13–29. The ALJ determined that

Belinda's medically determinable impairments could reasonably be expected to cause the alleged

symptoms, but that her statements concerning the intensity, persistence, and limiting effects of

these symptoms were not entirely consistent with the medical evidence and other evidence in the

record. *See* R. 21–29.

I find that substantial evidence supports the ALJ's conclusions regarding Belinda's

subjective allegations. In a Function Report dated September 28, 2018, Belinda reported that her

daily activities include the following:

> She indicated she lives with friends, and she stayed in her room aside from weekly
> grocery trips and monthly visits to her psychiatrist. She reported motivation
> difficulty to perform personal care tasks, and she bathed once per week. She
> indicated she did not need any special reminders to take care of personal needs or
> grooming, but her fiancé reminded her to take her medication in her first function
> report. She was able to prepare simple meals and, depending upon her mood, she
> sometimes might make more complex meals. She performed household chores such
> as dishes every other day and laundry every few days, but she needed reminders.
> She noted she shopped online for clothes and in stores for groceries approximately
> once per week for fifteen minutes, but if a longer trip was required, her fiancé went
> due to her social anxiety. In her initial function report, she stated she was able to
> pay bills, count change, handle a savings account, and use a checkbook/money
> orders. However, in her second function report, she said she could count change,
> but could not pay bills, handle a savings account, or use a checkbook/money orders
> because she did not "know how yet." . . . She endorsed hobbies including reading
> and writing, but she said she had difficulty concentrating.

R. 21–22. The ALJ explained how these reported daily activities factored into his analysis of the credibility of Belinda's subjective complaints and how that credibility determination translated into Belinda's RFC limitations. R. 21–28.

Belinda argues that the ALJ's assessment of her activities of daily living is deficient because he did not acknowledge "the extent to which she performed the activities" and "ignored other significant testimony."  ECF No. 19 at 33. In support of this argument, Belinda cites to *Brown v. Comm'r Soc. Sec.*, 873 F.3d 251, 269–70 (4th Cir. 2017); *Arakas v. Comm'r Soc. Sec.*, 983 F.3d 83, 100 (4th Cir. 2020) and other similar cases in the Fourth Circuit. In *Arakas*, the Court found that the ALJ's assessment regarding the claimant's daily activities failed to account for "significant other testimony" from the claimant that was at odds with the ALJ's conclusion. *Arakas*, 983 F.3d at 100. In doing so, the Court determined that the claimant's subjective allegations and activities of daily living were consistent. *Id.* This error is not present in this case. The ALJ considered Belinda's daily activities, as well as her allegations of her symptoms, and concluded that her reported daily activities suggest a lesser degree of functional loss than generally alleged. *See* R. 26.

In *Brown*, the Fourth Circuit found that the ALJ committed numerous errors, including failing to acknowledge the extent of the activities of daily living, stating:

> With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping." *See* Second ALJ Decision 11. The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared his meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities by Brown—showed that he could persist through an eight-hour workday.

31

873 F.3d at 263. Here, unlike in *Brown*, the ALJ's assessment shows he understood Belinda's limits in completing her activities of daily living. *See* R. 21–28. The ALJ specifically acknowledges that Belinda participates in her activities and is limited in several regards. *Id.* Thus, the ALJ did not err in his assessment of Belinda's subjective allegations.

Accordingly, I find that the ALJ's assessment of Belinda's subjective allegations is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, I find there is substantial evidence to support the Commissioner's decision. Therefore, I respectfully recommend that the presiding District Judge **DENY** Belinda's Motion for Summary Judgment, ECF No. 19; **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 25; **AFFIRM** the Commissioner's final decision denying Belinda's SSI claim; and **DISMISS** this case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Robert S. Ballou, United States District Judge.

The Clerk is directed to serve a copy of this Report and Recommendation to all counsel of record and any unrepresented parties.

Entered:  March 8, 2024

C. Kailani Memmer
United States Magistrate Judge